2012 Ark. App. 616

**Samuel Christopher LANDS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–1291.**

Court of Appeals of Arkansas.

Oct. 31, 2012.

Wright Law Firm, Little Rock, by: Victor D. "Trey" Wright, III, for appellant.

Dustin McDaniel, Att'y Gen., by: Pamela A. Rumpz, Ass't Att'y Gen., for appellee.

CLIFF HOOFMAN, Judge.

Appellant Samuel Christopher Lands appeals from his convictions for second-degree murder and first-degree battery, for which he received respective sentences of 360 months and 240 months. His sentences were also enhanced due to his use of a firearm during the commission of the offenses, for a total of 840 months' imprisonment. On appeal, Lands argues that there was insufficient evidence to support his convictions because he proved by a preponderance of the evidence that he suffered from a mental disease or defect at the time of the crimes. We affirm.

On April 19, 2010, Lands was arrested and charged with first-degree murder, attempt to commit murder, and the use of a firearm during the commission of the offenses. He then filed a notice of defense, raising the issue of his fitness to proceed

and notifying the State that he intended to rely on the defense of mental disease or defect. Lands was found fit to proceed to trial, and the eight-day jury trial began on May 17, 2011.

According to the evidence presented at trial, Lands was conditionally released from the Arkansas State Hospital on April 4, 2007, following a judgment of acquittal by reason of mental disease or defect in connection with previous charges of battery, escape, resisting arrest, and fleeing. Lands was released under Act 911,[1] and after first being housed at Birch Tree Communities, he transferred to Community Counseling, Inc. (C.C.), in Hot Springs and was placed in a group home with three other residents, including Ronnie Bradley. Scott Fleming was the house manager for the residents and assisted with transportation, groceries, laundry, and cooking. The conditions of Lands's release included such provisions as taking his medications as prescribed, submitting to random drug screens, and meeting with his counselors. When in compliance, Lands was permitted to have his own vehicle, and he also attended classes at a community college, where he obtained a heating and cooling certification. He was also allowed to apply for passes to leave the group home and visit his family.

On April 18, 2010, Lands returned to the group home from a weekend visit with his family in Sherwood. The next morning, two of Lands's roommates, Roderick Jones and Sedrick Edmonds, were awakened by gunshots outside the home. When Jones went to investigate, he found Scott Fleming lying on the ground and Ronnie Bradley sitting on a bench, both shot. Edmonds ran from the house and saw Lands driving away in the C.C. van.

Ronnie Bradley testified that, on the morning of April 19, 2010, he and Fleming were in the living room of the group home when Lands entered the room and started shooting. Bradley stated that he was shot twice and that Fleming was shot multiple times. Bradley testified that Lands searched for and found the keys to the C.C. van, then drove off before the police arrived. Melissa Brown, who was the house manager for the women's group home across the street, testified that she heard the gunshots and ran outside to find Fleming lying on the concrete outside of the men's home. She stated that Lands was standing nearby with a gun and that he demanded to know where her keys to the van were located. She told Lands where the keys were and then ran to secure her group home and call 911. After the 911 operator instructed Brown to go and check on Fleming's injuries, she found that Fleming was not breathing and that Lands had already driven away. It was later determined that Fleming had been shot thirteen times.

A "be on the lookout" bulletin was issued for Lands and the C.C. van, and soon afterward, Lands was apprehended by Corporal Chad Staley with the Arkansas State Police. Staley testified that Lands immediately pulled over and put both hands out the driver's side window. According to Staley, Lands was calm and aware of what was happening. Lands did become agitated at one point during the drive to the police station because he thought it was too hot in the car; he demanded that the air conditioning be turned on and began to kick at the vehicle door when he thought his demand had been ignored. Staley stated that Lands

---

1. Act 911 was enacted in 1989 and set forth statutory procedures to be followed subsequent to a defendant's acquittal by reason of mental disease or defect, such as the procedures governing conditional release orders.

was compliant, however, when they arrived at the police station.

Lands's parents testified that Lands was a happy and caring child up until his teen years. At that point, Lands's mother, Linda, stated that he became erratic and uncontrollable. She eventually took him to Bridgeway Hospital, where he was diagnosed as bipolar and given medication. Although Lands was "perfect" when he was on his medication, Linda testified that she could not force him to continue taking the medicine and that the police and the juvenile court became involved after his behavioral problems persisted. After Lands turned eighteen and the juvenile court lost authority over him, he lived at home with his parents until he committed the offenses in 2006 for which he was acquitted by reason of mental disease or defect and eventually placed in the C.C. group home.

In the months before the April 2010 incident, Linda testified that she had noticed a change in Lands and learned that his medication was slowly being decreased. She stated that Lands had become more argumentative and angry and that on the weekend prior to the murder, he started cursing when there was a dispute over the television. His father, Fred, warned Lands that he would be taken back to the group home if he did not behave, and Lands subsequently calmed down and apologized. After Lands's parents were notified of the murder, Fred discovered that his gun, which he rarely used, was missing from the top shelf of his closet and that the clip for the gun was also missing from his dresser drawer.

Courtney Bishop, who was Lands's counselor at C.C., testified that he had been transferred to the facility in October 2007. Although Lands had been allowed to move into independent living quarters in December 2007, he subsequently tested positive for illegal drugs in August 2008 and again in June 2009. He was required to move back into a group home, lost his driving privileges, and had his passes suspended. Although Lands continually requested to move to Little Rock or to return to independent living, he was told that he had to first maintain at least one year of sobriety. Bishop stated that Lands nonetheless pushed the issue with staff and that he complained of being bored. She testified that his behavior was often oppositional and that she attributed this to his being in treatment, having to take medication, and not getting to move home. Lands maintained that he did not suffer from a mental illness and requested that his medication be reduced. He instead blamed his legal and behavioral problems on substance abuse. Although Bishop was aware of Lands's prior diagnosis of bipolar disorder, she noted no signs of the disorder during the thirty months that he was at the facility and had previously expressed her concern that he had been misdiagnosed with Lands's psychiatrist, Dr. Kenneth Vest. As a result of these discussions, Bishop testified that Lands's medication was decreased starting in the fall of 2010 and that, at the time of the murder, he was not on his medications at all.

Chris Cox, another counselor at C.C., testified that Lands was in two of his therapy groups. Cox stated that Lands glorified his past drug use and that he did not think there was anything wrong with using illegal drugs. According to Cox, Lands did not think he needed to be in the Act 911 program and talked regularly about getting an early release. Cox indicated that Lands had a problem with authority and that he had a "bright future" if he could control those issues. Cox had seen no signs of delusions or psychosis in Lands, nor did he notice signs of bipolar

disorder. Instead, Cox believed that Lands was antisocial.

In January 2010, Lands was given several psychological tests by Lynn Terry, a psychological examiner with C.C. The two personality tests were consistent, with one suggesting that Lands had a narcissistic personality disorder with sadistic and paranoid features, and the other showing that he had an antisocial personality disorder. One of the tests also indicated a significantly heightened "drug dependence" scale. Terry stated that, although one of the tests had a bipolar scale, Lands's results in that regard were insignificant and that the test also showed no signs of schizophrenia.

Lands's psychiatrist at C.C., Dr. Vest, testified that at the time he started treating Lands, he had been taking Abilify due to his prior diagnosis of bipolar disorder. Starting in January 2009, Dr. Vest stated that he began decreasing the dosage and that he adjusted the dose up and down several times due to Lands's use of methamphetamine. In March 2010, Dr. Vest stated that Lands stopped taking his medication completely. During his treatment, Dr. Vest testified that he began to question whether Lands's diagnosis was accurate because he witnessed no signs of bipolar disorder. Dr. Vest also saw no symptoms of schizophrenia. He suspected that Lands suffered from antisocial personality disorder and substance abuse, which he stated was confirmed by the results of the psychological testing.

Dr. Michael Simon, a forensic psychologist, testified that he evaluated Lands at the State Hospital in October 2006. At that time, Dr. Simon believed that Lands understood the charges against him, but that he may not have been able to work with his attorney based on conversations in which Lands insisted that his attorney had told him to flee during a pretrial appearance. Thus, Dr. Simon initially opined in 2006 that Lands was not competent to stand trial. After a later evaluation, however, in which Lands acknowledged that he was not thinking correctly on the day he fled the courtroom, Dr. Simon found that Lands was competent to stand trial but that he was not competent at the time of the offenses. Dr. Simon diagnosed Lands with bipolar disorder with psychotic features, amphetamine abuse, and with having antisocial personality traits.

After Lands was charged with Fleming's murder and his Act 911 release was revoked, Dr. Simon stated that Lands was returned to the State Hospital, where he acted in an uncooperative and aggressive manner with the staff and other patients. According to Dr. Simon, it was the staff's opinion that Lands was not suffering from psychosis or a major mental illness but that he was only "acting out." He then reevaluated Lands on several occasions in September 2010. During these evaluations, Lands denied committing the crimes and was angry, but Dr. Simon stated that there was no indication of mental illness or psychosis. From his evaluations and his review of Lands's medical records, Dr. Simon ultimately concluded that Lands did not have a mental disease or defect. He further concluded that, even if Lands did suffer from a mental disease or defect, he was able to appreciate the criminality of his behavior and to conform his conduct to the requirements of the law. From Lands's actions after the murder, where he fled in the van, disposed of the murder weapon, and did not talk to the police, Dr. Simon testified that this was evidence that Lands appreciated the criminality of his conduct. Also, the fact that Lands secretly obtained the gun from his parents' home on his weekend pass, yet came back to the group home, hid the gun, and did not shoot anyone until the morning of the murder,

indicated to Dr. Simon that he was able to conform his conduct. Further, Dr. Simon noted that Lands did not shoot Melissa Brown when he demanded the keys and that this was also evidence that Lands could conform his conduct to the requirements of the law. When questioned about why his opinion on whether Lands suffered from a mental disease or defect had changed, Dr. Simon explained that his 2006 diagnosis was "somewhat equivocal" as to whether the symptoms were due to mental illness or drug use. He testified that it is difficult to differentiate between methamphetamine abuse and bipolar disorder and that he had originally opted to err on the side of getting treatment for Lands, who was only twenty years old at the time, instead of subjecting him to the criminal justice system.

Forensic psychiatrist Dr. Raymond Molden testified for Lands and found him fit to proceed to trial. However, Dr. Molden believed that Lands was affected by a mental disease or defect at the time of the 2010 offenses. From his review of the medical records and his two evaluations of Lands while in jail, Dr. Molden opined that Lands suffered from schizoaffective disease and that he was unable to conform his conduct to the requirements of the law. He was unable to reach an opinion as to whether Lands was able to appreciate the criminality of his actions because of a lack of evidence. Dr. Molden admitted that he had not spoken with Lands's prior counselors at C.C., his parents, or Dr. Simon. He further admitted that he was not aware of many of the details of the crimes, such as Lands's disposal of the murder weapon, and that he did not watch the videotape of Lands's arrest. Although he stated that he disagreed with Dr. Simon's conclusions, Dr. Molden acknowledged that there were frequent differences of professional opinion in his field.

At the conclusion of the trial, the jury rejected the affirmative defense of not guilty by reason of mental disease or defect and found Lands guilty of second-degree murder and first-degree battery. Lands was also found guilty of using a firearm during the commission of the offenses and was sentenced to a total of 840 months' imprisonment. He filed a timely notice of appeal from his convictions.

Lands argues that there was not substantial evidence to support his convictions for second-degree murder and first-degree battery because a preponderance of the evidence showed that he suffered from a mental disease or defect at the time of the offenses and thus did not have the required culpable mental states. According to Arkansas Code Annotated section 5-2-312(a) (Repl.2006), it is an affirmative defense to a prosecution if, at the time the defendant engaged in the conduct charged, he lacked the capacity as a result of mental disease or defect to (1) conform his or her conduct to the requirements of the law or (2) appreciate the criminality of his or her conduct. A defendant has the burden of proving the affirmative defense of mental disease or defect by a preponderance of the evidence. *Navarro v. State*, 371 Ark. 179, 264 S.W.3d 530 (2007). On appeal, we will affirm a jury verdict rejecting the defense of mental disease or defect when there is substantial evidence to support the verdict. *Id.*

Lands contends that there was no testimony offered to conclusively show that he was not suffering from a mental disease. He points to Dr. Molden's testimony that he was still suffering from a mental disease or defect in 2010 and asserts that it was only when he was completely taken off his medication that the offenses occurred. Lands recognizes Dr. Simon's testimony that he did not have a mental disease or

defect but argues that it is "ironic" that his opinion changed from 2006 and notes that there is no cure for mental illness.

We agree with the State that Lands failed to meet his burden of proving by a ⌊10⌋preponderance of the evidence that he suffered from a mental disease or defect sufficient to require acquittal. While Lands challenges Dr. Simon's opinion, it is the jury's duty to resolve conflicting testimony regarding mental competence, and the jury is entitled to believe the testimony of the State's expert over that of the defendant's expert. *Id.* The jury was therefore free to give credit to Dr. Simon's testimony that Lands had no mental illness, or that he was able in any event to appreciate the criminality of his conduct and to conform his conduct in accordance with the law. Thus, there was substantial evidence to support the jury's verdicts finding Lands guilty of second-degree murder and first-degree battery, and we affirm.

Affirmed.

VAUGHT, C.J., and ROBBINS, J., agree.